$400  **IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ELEV3N, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. _____ |
| v. | : | |
| | : | |
| VANBEX GROUP, INC., | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |
| | : | |

## COMPLAINT

Plaintiff Elev3n, LLC (the "Plaintiff" or "Elev3n"), by and through its undersigned counsel, pursuant to 28 U.S.C. §§ 1332, 2201, and 2202, 18 U.S.C. § 1836(b)(3)(A)(i), and Rule 65 of the Federal Rules of Civil Procedure, hereby files this Complaint against Vanbex Group, Inc. (the "Defendant" or "Vanbex") alleging as follows:[1]

## NATURE OF THE ACTION

1.      This action arises from Vanbex' unlawful use and marketing of intellectual property and other proprietary information belonging solely and exclusively to Elev3n and resulting securities law violations, whereby Vanbex has been unjustly enriched at Elev3n's expense and exposed Elev3n to great risk that it will become noncompliant with regulations promulgated by the United States Securities and Exchange Commission (the "SEC") and equivalent regulatory authorities in Canada.

---

[1]      The Motion for Temporary Restraining Order and Preliminary Injunction, as well as the supporting declarations and exhibits annexed thereto, hereby are incorporated by reference.

2.      Both Vanbex and Elev3n use blockchain technology[2] to develop computer applications with imbedded functionalities that are managed and manageable by a global network of computers. One such application developed by Vanbex is Etherparty, which is "a contract wizard that removes the complexity of creating, managing and executing smart contracts on any blockchain."[3] To raise money for its Etherparty application, Vanbex will launch an initial coin offering ("ICO"), which is like an IPO, except that it raises cryptocurrencies[4] as start-up capital.

3.      In August and September 2017, Vanbex already pre-sold certain unregistered quasi-Securities in its Etherparty product to the public (the "pre-Sale"). In the process, it raised over $25,000,000 in currency and cryptocurrency in a combination of United States Dollars, Bitcoin cryptocurrency, Ethereum cryptocurrency,[5] and other undisclosed currency. The ICO itself has been scheduled for this coming Sunday, October 1, at 12 p.m. (ET) Eastern Standard Time. Should Vanbex be permitted to complete the ICO and sell all of its offered quasi-Securities, it would generate at least $62,500,000 in funds to Elev3n's detriment.

---

[2]    Blockchain has been defined as

   A distributed database that maintains a continuously-growing list of records secured from tampering and revision. Each block contains a timestamp and a link to a previous block. The blockchain - conceived in 2008 and first implemented in 2009 - is the main technical innovation of bitcoin, where it serves as the public ledger for bitcoin transactions. In this case, every user is allowed to connect to the network, send new transactions to it, verify transactions, and attempt to create new blocks. The bitcoin blockchain design has been the inspiration for other applications.

(https://tokenmarket.net/what-is/blockchain/).

[3]    Available online at https://etherparty.io/

[4]    "A cryptocurrency is a digital asset designed to work as a medium of exchange using cryptography to secure the transactions and to control the creation of additional units of the currency." (https://en.wikipedia.org/wiki/Cryptocurrency).

[5]    Ethereum is an open-source, public, blockchain-based distributed computing platform featuring smart contract (scripting) functionality.... Ethereum also provides a cryptocurrency token called "ether", which can be transferred between accounts and used to compensate participant nodes for computations performed. (https://en.wikipedia.org/wiki/Ethereum).

2

4.     The materials Vanbex is using in connection with the ICO all belong exclusively to Elev3n and are not yet SEC compliant. Consequently, Vanbex has committed various torts, as further alleged herein, such as conversion, computer crime, and copy right infringement, has breached the Contract (later defined), and subjects Elev3n to imminent extraordinary liability both due to the breach of the Contract and resulting exposure to US and Canadian self-regulatory organizations that oversee the issuance of monies offered in connection with the ICO.

5.     Elev3n engaged Vanbex to prepare those materials for Elev3n's own ICO. Elev3n paid Vanbex $39,000 USD to prepare these materials–funds Vanbex appears to have converted to produce the ICO for its Etherparty product. But not only that. On September 19, 2017, Elev3n through sheer "accident," discovered that Vanbex had for months been unlawfully accessing Elev3n's company computer systems in the USA to disseminate, distribute, and modify Elev3n's confidential intellectual property in preparation for the pre-Sale and ICO.[6]

6.     Vanbex already has received a windfall from its illegal activities in direct violation of its obligations and contractual duties owed to Elev3n. Elev3n stands to suffer further, imminent and irreparable injury if Vanbex is not immediately enjoined from using Elev3n's property and from proceeding with the ICO.

7.     Elev3n additionally faces imminent and irreparable injury, because the SEC has indicated that cryptocurrencies generated through crowdfunding such as ICOs are considered securities within the purview of its regulatory authority. By disseminating Elev3n's technology and copyrighted materials before they have been made SEC compliant, Vanbex exposes Elev3n to liability to the SEC and equivalent regulatory bodies in Canada, collectively organized under

---

[6]     Even though Vanbex is headquartered in Vancouver, British Columbia, the pre-Sale targeted United States Citizens and persons in the Commonwealth of Pennsylvania. Vanbex has continued to promote public participation to its ICO in the USA.

3

the Canadian Securities Administrators ("CSA"), for instance, by repurposing these materials as quasi-Security prospectuses that may imminently be relied upon by the public to purchase quasi-Securities. Based on the foregoing and the declarations filed concurrently herewith, which hereby are incorporated by reference, a temporary restraining order against Vanbex must issue to protect Elev3n from such irreversible, imminent harm.

## JURISDICTION

8.      This Court has jurisdiction to hear this matter and fashion the requested relief pursuant to 28 U.S.C. § 2201, which permits this Court to "declare the rights and legal relations" of parties in "a case of actual controversy within its jurisdiction" and 28 U.S.C. § 1332(a)(2), which gives this Court "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between [...] citizens of a State and citizens or subjects of a foreign state," Fed. R. Civ. P. 65, and 18 U.S.C. § 1836(b)(3)(A)(i) which gives this Court authority to issue an injunction to "prevent any actual or threatened misappropriation" of trade secrets.

## THE PARTIES

9.      Plaintiff Elev3n, LLC is a limited liability company organized under the laws of the Commonwealth of Pennsylvania and headquartered in Philadelphia, Pennsylvania.

10.     Defendant Vanbex Group, Inc. is a corporation formed in 2014 under the Canada Business Corporations Act with its principal place of business at 789 West 50th Avenue, Vancouver, BC V6P 1A4, Canada.  It registered agent is located at 800 - 885 West Georgia Street

Vancouver BC V6C 3H1, Canada.  Even though Vanbex is a Canadian entity, it is subject to jurisdiction in the United States because it has a pervasive presence there by virtue of, among

4

other things, soliciting funds from United States investors.    Vanbex holds itself out as specializing in digital currency and blockchain technology.

## FACTUAL AND PROCEDURAL BACKGROUND

11.    In the Summer of 2016, Elev3n sought a partnership to obtain market share of Bitcoin and Ether cryptocurrency and to further develop its technology using the quasi-Software capabilities of Ethereum to power smart contracts for alternative medicine health providers.[7]  To that end, it entered into negotiations with Vanbex about working together in September of 2016. On September 8, 2016, the parties entered into a non-disclosure agreement (the "NDA")[8] and by contract with Elev3n dated October 3, 2016 (the "Contract"), Vanbex agreed to develop a technology platform for Elev3n, and to market, promote, and guide Elev3n through the ICO process so Elev3n could review making an ICO to the public in the United States (collectively, the "IP Services").[9]

12.    The Contract provides, among other things, that Vanbex develop the platform for Elev3n's ICO and solicited that it be compensated for its services by a combination of U.S. Dollars, U.S. securities in the form of Elev3n's equity in its LLC membership units, and securities compensation in a contract for 20% of the proceeds of the Elev3n ICO.[10]  In other words, Vanbex made material representations in connection with an offer to purchase and sell securities–which, as is further described below, were false.

13.    During negotiations leading up to the contract for development of the platform and purchase of securities, Vanbex represented to Elev3n that it previously had successfully

---

[7]      Doreian Decl. ¶ 2.
[8]      A copy of the NDA is attached to the Doreian Decl. as Exhibit B.
[9]      See October 3, 2016 Contract, attached to the Doreian Decl. as Exhibit C.
[10]     See Contract at 3, 4.

completed ICOs selling securities in the U.S.[11] At the time, Vanbex's CEO, Kevin Hobbs, represented to Elev3n that "there is no compliance regulating ICO's...[but] we at Vanbex consider it like an IPO."[12]  Mr. Hobbs further told Elev3n that Kipling Warner would be principally responsible for the development of the Elev3n platform.[13] Elev3n had high regards Mr. Warner as a software developer.[14]

14.     Vanbex' representations that Mr. Warner was their Chief Technology Officer in charge of the platform development were material to the Contract, because Elev3n wanted his expertise in developing artificial intelligence and machine learning technology for Elev3n's platform.[15] According to Vanbex, Mr. Warner would oversee other software developers working on the IP Services.  Under the Contract, the first IP Service to be delivered was Elev3n's website.[16]

15.     Mr. Warner, however, as it turned out, was at no point in time Vanbex' Chief Technology Officer.  In fact, Vanbex did not approach Mr. Warner to work for them until after the Contract approached execution and when he did, starting on September 28, 2016, it was in the capacity as Director of Engineering.[17]  Once at Vanbex, Mr. Warner was instructed not to work on Elev3n's platform, but instead work on internal products for Vanbex.[18] According to Mr. Warner, "as the Director of Engineering, I had no engineers to direct. I did not have a workstation[, there] were no engineering schematics, working notes, source code, build

---

[11]     Doreian Decl. ¶ 11

[12]     See email correspondence dated October 4, attached to the Doreian Decl. as Exhibit D.

[13]     Doreian Decl, ¶ 14

[14]     Id. ¶ 13

[15]     Id. ¶ 12,14

[16]     Id. ¶ 15

[17]     Warner Decl. ¶ 2

[18]     Doreian Decl. ¶ 8

6

environment, executable programs, object code, formulae, algorithms, data structures, or other materials essential to the actual functionality of the underlying technology."[19] The development and promotional services offered by Vanbex were not centered around engineering, but rather centered around developing ICOs: "Vanbex did not appear to have any technological assets – past or present. The only materials it had were promotional, browser based cosmetic user interfaces, and marketing materials. I was the only software engineer with a relevant formal academic background that they had ever retained."[20]

16.     Vanbex also promised Elev3n a team of professionals to help it develop its business and platform.[21]  It told Elev3n it would have two web developers to build Elev3n's website.[22]  It told Elev3n it would have a community and a social media manager, Nicola Minichiello. Elev3n never met or otherwise interacted with Nicola Minichiello.[23]

17.     Elev3n first was alerted that Vanbex was not performing work as it was required to under the Contract, when it received the first version of the website that Vanbex had "developed" for Elev3n–"which was awful"–but not surprisingly, because it had been created, according to Mr. Hobbs, by Lisa Cheng, Vanbex' Head of Research and Development with no website development experience, in an all-nighter before the website was due.[24]

18.     This was the first in a series of problems and disputes relating to the fact that no work was accomplished by Vanbex for Elev3n's platform or ICO.  It became clear that Vanbex was focusing its energy elsewhere, that Mr. Warner and the other resources promised to be

---

[19]    *Id.* ¶ 6
[20]    Warner Decl. ¶ 4
[21]    See September October 3, 2016 signed engagement proposal, attached to the Doreian Decl. as Exhibit C
[22]    Doreian Decl. ¶ 12
[23]    *Id.* ¶ 17
[24]    *Id.* ¶ 18

allocated for work on Elev3n's platform or ICO were put to different use, and that "at some points it felt like nobody was working on Elev3n."[25]   Elev3n, however, remained busy: While Vanbex was busy breaching the Contract, Elev3n completed the majority of their preparation work related to preparation and analysis of the validity of the Elev3n ICO, including developing the Elev3n Prospectus, and related copyrights and intellectual property.[26]

19.     On December 13, 2016, Elev3n gave notice to Vanbex that the Contract was terminated due to Vanbex' failure to perform the IP Services as contractually agreed.[27]   Elev3n demanded that Vanbex terminate its access to all materials identified in the Contract, all of which are property of Elev3n under the Section 7.2 of the Contract.  Elev3n directed Vanbex to return "all work-product completed under the [contract], including all source and object code as well as any other intellectual property, no later than January 15, 2017.  Vanbex is to further return and / or destroy all confidential information or other materials provided to it by Elev3n."[28]

20.     On December 17, 2016, Mr. Hobbs responded that "we will turn over all our work in progress and completed to you and cease all further work"[29]–a rather curious statement, given that Vanbex had provided little to no IP Services and that materials on the parties' shared platform almost exclusively had been prepared by Elev3n.

21.     On December 30, Mr. Hobbs allegedly restricted the access rights of Vanbex representatives to Elev3n's ITOM, Elev3n's Marketplace Creation plan, and Elev3n's Partnership proposal (collectively, the "Elev3n Prospectus"). However, on January 17, 2017 – two days after Vanbex was to return all of Elev3n's confidential material – its Marketing and

---

[25]     *Id.* ¶ 20

[26]     *Id.* ¶ 24

[27]     See termination letter, attached to Doreian Decl. as Exhibit E.

[28]     *Id.*

[29]     *Id.*

8

Communications Manager Brandon Kostinuk unlawfully accessed Elev3n's computer systems and shared the Elev3n Prospectus with unknown parties. On January 29, 2017, Ms. Cheng told Elev3n that Vanbex would be "sending you all the files and documents that Vanbex has created and worked on for you."[30]

22.    On March 10, Mr. Kostinuk again unlawfully accessed Elev3n's computer systems and shared the Elev3n Prospectus with unknown parties. On May 15, Elev3n sued Vanbex for breach of contract over the $39,000 it paid to Vanbex for the expected IP Services in small claims court in Vancouver (the "Suit").[31] On June 6, Mr. Kostinuk, while the Suit was pending, again accessed Elev3n's computer systems and shared the Elev3n Prospectus with Vanbex' User Interface and User Experience designer Christer Guillergan.

23.    On June 12, Mr. Kostinuk again accessed Elev3n's computer systems and shared the Elev3n Prospectus with Johanna Maaghul, Vanbex's recently hired Blockchain/ICO Whitepaper Writer, as well as two unknown parties. Ms. Maaghul, hired by Vanbex in June, describes her function at Vanbex on LinkedIn as "develop[ing] white papers and documentation to illustrate blockchain and cryptocurrency value for emerging market clients utilizing blockchain, Bitcoin and Ethereum technology."

24.    On Jun 13 and again on July 5, Mr. Kostinuk, undeterred, unlawfully accessed Elev3n's computer systems and shared the Elev3n Prospectus with unknown parties. On July 6, Vanbex announced the ICO and distributed the Etherparty Whitepaper (the "Counterfeit Prospectus"), a rip-off of the Elev3n Prospectus through a website forum alias named "etherparty." On July 8, Vanbex' CEO presented the Counterfeit Prospectus and other marketing materials at a "cryptofinancing" financial technology event in London. On July 12, he presented

---

[30]    See email correspondence letter, attached to Doreian Decl. as Exhibit G

[31]    At the time the Suit was filed, Elev3n was not aware of the extent of Vanbex' misconduct.

the Counterfeit Prospectus and other marketing materials at another financial technology event in London. On July 19, subsequent to promoting the ICO and claiming that the ICO for Etherparty was by Vanbex, Mr. Hobbs and Ms. Cheng formed Etherparty Smart Contracts Inc.

25.     On July 26, Vanbex announced on BitCointalk.com the etherparty ICO. On July 26, an unknown party unlawfully accessed Elev3n's computer systems and changed permissions to allow editing by a Vanbex affiliate. Immediately thereafter, Mr. Kostinuk, with the Suit still pending, unlawfully accessed Elev3n's computer systems and restricted access to the Elev3n Prospectus that was shared and permissions modified by unknown parties.

26.     On August 4, Mr. Kostinuk unlawfully accessed Elev3n's computer systems, changed permissions and access to, and distributed the Elev3n Prospectus to Caroline Klukowski, Vanbex' Director of Communications specializing in "Coin Offering Marketing." On August 8, an unknown party unlawfully accessed Elev3n's computer systems and gave permissions to allow editing the Elev3n Prospectus to Todd Hauptman, Vanbex' recently hired Public Relations Manager. Mr. Hauptman is an International Public Relations Specialist hired by Vanbex in August 2017.

27.     On August 9, Vanbex' User Interface and User Experience designer Christer Guillergan, unlawfully accessed Elev3n's computer systems, distributed, and gave permissions to edit the Elev3n Prospectus to Benedetta Milani. Ms. Milani is Vanbex' recently hired Blockchain Marketing and Social Media Manager. On August 9, Mr. Kostinuk unlawfully accessed Elev3n's computer systems, and changed permissions and access permissions to the Elev3n Prospectus.  On August 16, he unlawfully accessed Elev3n's computer systems, and changed permissions and access permissions to the Elev3n Prospectus.

10

28.      On August 21, two days before the ICO pre-Sale went live, Mr. Kostinuk unlawfully accessed Elev3n's computer systems, and distributed access to the Elev3n Prospectus to the everyone at Vanbex, as well as Andy Pang. Mr. Pang is listed on the PR Team for Etherparty platform. On August 23, Vanbex' Etherparty ICO pre-Sale went live and began selling securities. On September 13, Mr. Kostinuk unlawfully accessed Elev3n's computer systems, and distributed, and gave permissions to edit the Elev3n Prospectus to a Daniel Graf, who has a Vanbex.com email address but is not listed on the company materials. On September 15, Mr. Kostinuk unlawfully accessed Elev3n's computer systems, and distributed, and gave permissions to edit the Elev3n Prospectus to recently hired Business Development Executive Suneet Sandhu.

29.      On September 19, Mr. Kostinuk unlawfully accessed Elev3n's computer systems, and distributed, and gave permissions to edit the Elev3n Prospectus to Brian Onn. On September 19, after conferring with the undersigned counsel, Elev3n's CEO went to look for a document related to the Suit against Vanbex, and was alerted to unauthorized access to its computer systems while examining the systems.

## COUNT I
### Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030

30.      Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

31.      Plaintiff and Defendant entered into the Contract by which Defendant was supposed to provide the IP Services. Defendant, consequently, was given access to certain of Plaintiff's proprietary information. Such access was governed by the NDA.

11

32.    After the Contract was terminated, Defendant accessed Plaintiff's computers on numerous occasions without authorization or in excess of authorization, and, in the course of such unauthorized access, obtained information belonging to Plaintiff and damaged computer data.

33.    Defendant accessed Plaintiff's computer network knowingly and with intent to defraud prospective investors and to deprive Elev3n of an economic benefit while exposing it to liability under applicable securities law.

34.    By means of such unauthorized access, Defendant furthered the intended fraud and obtained Eleven's Prospectus, materials, and other proprietary information, which Defendant used to further its pre-Sale and ICO.

35.    Defendant's conduct constitutes a violation of the Computer Fraud and Abuse Act.

36.    Elev3n has been damaged by Vanbex' violation of the Computer Fraud and Abuse Act in an amount to be determined at trial.

## COUNT II
### Conversion

36.    Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

37.    Plaintiff and Defendant entered into the Contract by which Defendant was supposed to provide the IP Services. Defendant, consequently, was given access to certain of Plaintiff's proprietary information. Such access was governed by the NDA.

38.    After the Contract was terminated, Defendant accessed Plaintiff's computers on numerous occasions without authorization or in excess of authorization, and, in the course of

such unauthorized access, obtained information belonging to Plaintiff and damaged computer data.

39.    During and following such unauthorized access, Defendant deprived Plaintiff of, and interfered with Plaintiff's rights in Plaintiffs proprietary and confidential materials, in that it

> a.  Used said materials to further its own agenda with respect to the pre-Sale and ICO;
>
> b.  Held the Counterfeit Prospectus out to the public as its own, when it had been developed by and belongs to Plaintiff; and
>
> c.  Exposed Plaintiff to regulatory censure by disseminating such materials before they were made compliant with applicable securities regulations.

40.    The aforementioned conduct occurred without Plaintiff's consent and without lawful justification.

41.    Elev3n has been damaged by Vanbex' conversion in an amount to be determined at trial.

### COUNT III
### Violation of U.S. Copyright Act, 17 U.S.C. §§ 101 - 810

42.    Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

43.    Plaintiff and Defendant entered into the Contract by which Defendant was supposed to provide the IP Services.  Defendant, consequently, was given access to certain of Plaintiff's proprietary information.  Such access was governed by the NDA.

44.    After the Contract was terminated, Defendant accessed Plaintiff's computers on numerous occasions without authorization or in excess of authorization, and, in the course of

13

such   unauthorized   access,   obtained   information   belonging   to   Plaintiff   and damaged computer data.

45.     Pursuant to the Contract and the NDA, as well as applicable common law, Plaintiff had exclusive rights to Plaintiff's proprietary information, including the exclusive rights (1) to reproduce the copyrighted work in copies (2) to prepare derivative works based upon the copyrighted work and (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

46.     Plaintiff owns a valid copyright in its proprietary information.

47.     Defendant unlawfully copied constituent elements of Plaintiff's original work.

48.     Defendant willfully infringed upon Plaintiff's copyright intending to profit therefrom.  In fact, it already raised $25,000,000 in connection with the use of Plaintiff's original proprietary information and will stand to profit even more should the IPO proceed.

49.     Elev3n has been damaged by Vanbex' violation of the Copyright Act in an amount to be determined at trial.

## COUNT IV
## Breach of Contract

50.     Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

51.     Plaintiff and Defendant entered into the Contract by which Defendant contractually obligated itself to provide the IP Services.

52.     Plaintiff, in accordance with the terms of the Contract, paid Defendant to provide the IP Services.

14

53.     Defendant materially breached the Contract when it failed to provide the IP Services as required under the Contract.  In fact, the IP Services contemplated by the Contract all were performed by Plaintiff's employees and other authorized representatives.

36.     Defendant has failed to cure the material breach.

37.     Elev3n has been damaged by Vanbex' breach of the Contract in an amount to be determined at trial.

**COUNT V**
**Unjust Enrichment**

38.     Plaintiff repeats and realleges the allegations in the foregoing paragraphs as if fully set forth herein.

39.     Plaintiff and Defendant entered into the Contract by which Defendant contractually obligated itself to provide the IP Services.

40.     Plaintiff, in accordance with the terms of the Contract, paid Defendant to provide the IP Services.

41.     Defendant materially breached the Contract when it failed to provide the IP Services as required under the Contract.  In fact, the IP Services contemplated by the Contract all were performed by Plaintiff's employees and other authorized representatives.

42.     Defendant has failed to cure the material breach.

43.     By retaining funds Elev3n paid it to provide the IP Services, Vanbex has been unjustly enriched at Elev3n's expense against fundamental principles of justice or equity and good conscience.

**COUNT VI**
**Injunctive Relief Against Vanbex**

15

44.     Plaintiff hereby realleges and incorporates all preceding paragraphs as if fully set forth herein.

45.     Plaintiff and Defendant entered into the Contract by which Defendant was supposed to provide the IP Services.  Defendant, consequently, was-given access to certain of Plaintiff's proprietary information.  Such access was governed by the NDA.

46.     After the Contract was terminated, Defendant accessed Plaintiff's computers on numerous occasions without authorization or in excess of authorization, and, in the course of such unauthorized access, obtained information belonging to Plaintiff and damaged computer data.

47.     As is set forth above and in the Motion for Temporary Restraining Order and Preliminary Injunction and supporting declarations and exhibits annexed thereto filed concurrently herewith, which hereby are incorporated by reference, Defendant's conduct is illegal and tortious.

48.     Plaintiff is entitled to a permanent injunction prohibiting Vanbex from further unlawfully using and infringing upon Elev3n's trade secrets and other proprietary information.

## COUNT VII
### Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201-2

49.     Plaintiff hereby realleges and incorporates all preceding paragraphs as if fully set forth herein.

50.     Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C §§ 2201 and 2202 regarding issues of fact and law and the parties' respective rights and obligations under the Contract and NDA, including the following:

> a.     Elev3n has exclusive rights in all IP Services and materials developed under the Contract;

16

b.    Vanbex violated 15 U.S.C § 77l by making material misstatements and omissions to Plaintiff in connection with the Contract, which contemplated the issuance (i.e., sale and purchase) of securities;

c.    Vanbex violated 15 U.S.C § 77t(b) by making material misstatements and omissions to Plaintiff in connection with the Contract, which contemplated the issuance (i.e., sale and purchase) of securities;

d.    Vanbex violated 15 U.S.C § 78j(b) by making material misstatements and omissions to Plaintiff in connection with the Contract, which contemplated the issuance (i.e., sale and purchase) of securities;

e.    Vanbex violated Rule 10b-5 of the Securities Exchange Act of 1934, 17 C.F.R. 240.10b-5 by making material misstatements and omissions to Plaintiff in connection with the Contract, which contemplated the issuance (i.e., sale and purchase) of securities;

51.    The determination of this issue between Plaintiff and Defendant entails an actual controversy in that this controversy involves the rights or other legal relations of the parties with regard to the Contract and NDA; the claim of right or other legal interest is asserted against Defendant, who have an interest in contesting the claim; the controversy is between parties whose interests are real and adverse; and the issue involved in the controversy is ripe for judicial determination.

## JURY TRIAL DEMANDED

52.    Plaintiff demands a trial by jury for all matters so triable.

## PRAYER FOR RELIEF

17

For all the foregoing reasons stated, Plaintiff respectfully requests judgment against Defendant, as follows:

a)   For damages in such amount as may be found, or as otherwise permitted by law.

b)   For an accounting of, and the imposition of constructive trust with respect to Defendant's profits attributable to is conversion and copyright infringement;

c)   For a preliminary and permanent injunction prohibiting Defendant from further unlawfully using and infringing upon Elev3n's proprietary information;

d)   For prejudgment interest according to law

e)   A declaration concerning the parties' rights or other legal relations with regard to the Contract and NDA;

f)   For Plaintiff's costs and fees associated with bringing this action; and

g)   For such other and further relief as is just and proper under the circumstances.

Respectfully submitted,

KLEIN LLC

Julia B. Klein (PA 207726)
919 N. Market Street, Suite 610
Wilmington, DE 19801
klein@kleinllc.com
(302) 438-0456

and

18

GrowthCounsel LLC
John Kirk, Esquire (PA 308436)
448 N. 10th St., Suite 301
Philadelphia, PA 19123
john@GrowthCounsel.com
(512) 862-4379

*Counsel to Elev3n*

Dated: September 29, 2017